**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA )
)
vs. )   **Crim. No. 00-72**
)   **(Civ. No. 04-1098)**
**DONALD G. JACKMAN** )
)
**Defendant.** )

**Opinion and Order**

Before the Court is Petitioner Donald G. Jackman, Jr.'s Motion to Vacate under 28 U.S.C.

2255 filed at Criminal No. 00-72 (Doc. 140), and assigned Civil Action No. 04-1098. The

government filed a Response to the Motion, to which Mr. Jackman has filed a reply brief as well as

several supporting supplemental briefs.

*Background*

On April 12, 2000, Donald G. Jackman, Jr. was charged in a two-count superseding

indictment with possession of firearms by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1)

and 924(e) (Count I); and possession of an unregistered firearm in violation of 26 U.S.C. §§

5661(d) and 5871 (Count II). The government alleged in Count I that Mr. Jackman was found in

possession of firearms after having been convicted of possessing and trafficking cocaine, the sale of

marijuana, and the sale of cocaine in North Carolina.

The government alleged in Count II that Mr. Jackman was found in possession of a firearm

as defined by 26 U.S.C. § 5845(a) & (f) that was not registered to him in the National Firearms

Registration and Transfer Record as required by 26 U.S.C. § 5841. The firearm found was a

destructive device consisting of a six inch cardboard tube containing explosive powder, ball

bearings glued on the outside of the tube, and an ignition fuse.

A bifurcated trial began on February 11, 2002. On February 14, 2002, a jury found Mr.

Jackman guilty of possession of an unregistered firearm, in violation of 26 U.S.C. §§ 5661(d) and

5871. Both parties were prepared to begin trial on Count I that same afternoon, but trial was postponed to the next morning so that the parties could discuss a possible plea. On February 15, 2002, the parties informed the Court that Mr. Jackman agreed to plead guilty to possession of firearms by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(e), which he did that same date.

Mr. Jackman was subject to the provisions of the Armed Career Criminal Act, making his guideline sentence range 262-327 months' imprisonment. On September 17, 2002, Mr. Jackman was sentenced to 262 months' imprisonment for the possession of firearms by a convicted felon charge and 120 months' imprisonment for the possession of an unregistered firearm charge, to be served concurrently for a total term of imprisonment of 262 months.

He timely filed an appeal from his conviction on September 26, 2002. The United States Court of Appeals for the Third Circuit affirmed the conviction and sentence on October 6, 2003.

### *Motion to Vacate*

On July 26, 2004, Mr. Jackman filed a *pro se* Motion to Vacate, Set Aside, or Correct Sentence ("Motion to Vacate"), pursuant to 28 U.S.C. §2255. Mr. Jackman asserts numerous claims in several pleadings. He readily acknowledges that at times his claims may be repetitive or overlapping, or simply a different aspect of the same claim. He reasonably explains that he acted out of an abundance of caution so as to not inadvertently fail to assert a claim. With that in mind Mr. Jackman's raised the following grounds for relief:

1. Initial Arrest was based on an improperly issued State warrant for a citation offense under appeal.

2. No required Miranda warnings were issued until an hour after arrest. Waiver of rights and consent to search were coercively obtained through inflicting physical pain by the means and manner in which Mr. Jackman was handcuffed.

3. Excessive force prior to search through inflicting physical pain by the means and manner in which Mr. Jackman was handcuffed.

4. Initiation of investigation was improperly based on misrepresented facts relayed by a confidential source. Nighttime aircraft surveillance was misrepresented as not having some type of night vision, and if it did not have night vision the agents were committing fraud by joyriding in the aircraft. The resulting search warrant was

2

procured by false statements, there was no evidence that any crime had been committed, and the government has continually withheld Mr. Jackman's approved purchase records regarding his guns.

5. Bail was denied based on misrepresented facts, unrelated issues, and a fabricated "fictitious" danger to the community.

6. Denial of proper medical attention due to shoulder injury caused by excessive time in handcuffs.

7. Numerous acts of perjury and obstruction of justice committed by federal agents and the prosecution.

8. Denial of right to speedy trial; denial of a just trial.

9. Violation of the right to confront witnesses as the confidential source and a Police Officer from North Carolina never appeared to testify.

10. Violation of the right to a compulsory process of witnesses in favor of the defense and unjustly prejudicing the defense as certain witnesses were intimidated by the government in order to cooperate against the defense.

11. Denial of a fair trial due to flawed and biased jury selection process in that the prosecution was permitted to strike "all" National Rifle Association members. Jury was also tainted by prejudicial statements and use of enlarged photo of pest control device.

12. Conviction obtained as a result of numerous instances of fraud by the prosecution.

13. Constitutional violation of right to discovery and profits from invention of goose dispersal device.

14. Ineffectiveness of counsel and bias of counsel in withholding exculpatory evidence; in failing to make objections to acts of perjury, miscarriage of justice, and altering of transcripts; failure to pursue the following items: defenses, speedy trial issues, restoration of rights issues, matters of first impression, issues of ambiguous nature, whether notice of firearm purchase puts one in violation of law issues, witness issues, improper prosecution acts towards defense witnesses, and failure to pursue defenses.

15. Exculpatory evidence of Mr. Jackman's compliance with all firearm and explosives laws withheld by the prosecution, and defense counsel, and replaced with fictitious evidence.

16. Jurisdictional issues invalidate the conviction in that the Court lacked jurisdiction to hear the case for several reasons. Among others, federal jurisdiction could not be based on Title 18 and 26 since neither lack the required enacting clauses, and no reason was given for ignoring the Pennsylvania Constitution's right to bear arms; there was no violation because there was no "ownership" of the firearms; and no nexus to interstate commerce.

3

17. Mr. Jackman not permitted to witness or be present during search in violation of Federal Rules of Criminal Procedure 41(f)(1), (f)(2), and (f)(3).

18. Not permitted to withdraw Plea to Count I of the Indictment, which plea was illegally induced after conviction by tainted jury on Count II of the Indictment

19. Denial of equal protection of the law.

20. Conviction secured when the Estoppel Defense existed in a matter of actual innocence. (Entrapment by Estoppel). Estoppel Defense denied due to withholding of approved firearms records and failure of Court to read the full Restoration of Rights Certificate.

21. Conviction secured by bias and prejudice of the Court in permitting unrestrained acts of miscarriage of justice by prosecution, in appointing defense counsel, in jury selection, in granting forfeiture at all as well as in granting forfeiture for items not listed on warrant, in improperly ruling on motions in favor of prosecution. in allowing perjured testimony, and many other blatant issues.

22. Unjustly forced into taking plea to Count I as a result of coercion and manipulation of jury that convicted on Count II.

23. As a result of the conviction the district court granted forfeiture in violation of the United States Code, the Code of Federal Regulations, the Pennsylvania Constitution and the United States Constitution, in particular the confiscation of firearms is a secondary punishment in violation of the protection against double jeopardy, .

24. Warrant and Indictment were invalid from the beginning as at no time was there ever "actual or constructive" possession of any firearm, there was only "ownership: which is not a state or federal crime.

25. Conviction was secured using statutes and codes that have created an irreconcilable indifference of law that further conflicts with both the Pennsylvania Constitution and the United States Constitution. In particular the irreconcilable in differences of law occurs between 8 U.S.C. § 1481 and 18 U.S.C. §§ 921 and 922, and 26 U.S.C. § 5845.

26. Constitutional violation through altering or removing of testimony and evidence form the transcribed record.

27. Conviction and sentencing was contrary to government approved conduct and Pennsylvania Constitutional provision in part through the government approving of the purchase of firearms instead of denying purchase or informing purchaser that said purchase would violate the law.

28. Federal agents stole property under the guise of confiscation that was not listed on search warrant and was not property subject to forfeit.

29. Denial of right to attorney.

30. Case initialed on false grounds or no actual Grand Jury decision.

4

31. Violation of right to make a living, own property, life, liberty, and the protection thereof, as guaranteed by the Pennsylvania Constitution and the United States Constitution.

32. Violations of the right to redress.

33. Sentence imposed with no consideration for the rule of Lenity.

34. Violation of the right to confrontation.

35. Violation of the right to have jury determine whether enhancement for upward departure was warranted in violation of Blakely.

36. Violation of protection against double jeopardy since Mr. Jackman was engaging in legal conduct under the United States and Pennsylvania Constitutions, and that legal activity was made "illegal" only by use of Mr. Jackman's past conviction, thus constituting double jeopardy used.

(Motion to Vacate (Doc. 140), Allegation of Jurisdiction (Doc. 142), and Supplemental

Memorandum of Law (Doc. 147).)

The government filed its response brief to the motion to vacate on September 30, 2004

(Doc. 145), to which Mr. Jackman filed a 62-page reply brief on October 18, 2004 (Doc. 146). On

December 2, 2004, Mr. Jackman filed a Supplemental Brief addressing his "irreconcilable

indifference of law" issues. (Doc. 147). On December 5, 2005, Mr. Jackman filed a Memorandum

of Law Nexis of Citizenship (Doc. 160), also addressing his irreconcilable indifference of law

issues.

Mr. Jackman also filed pleadings throughout the pendency of his motion to vacate. On

April 27, 2005, Mr. Jackman filed a Motion for Judicial Review of Freedom of Information Act

(FOIA) Denial (Doc. 153). On May 10, 2005 he filed a Motion for Leave to File for Discovery

(Doc. 151), and a Motion to Compel Discovery (Doc. 152). On June 9, 2005, he filed a Motion for

Judicial Review (Doc. 154).

At the corresponding Civil Action Number 04-1098, Mr. Jackman filed a Motion for

Production of Audiotapes (Docs. 1 & 2) on August 2, 2005. On October 12, 2005, Mr. Jackman

filed a Motion for Summary Judgment (Doc. 3). Finally, on October 17, 2005, he filed a Renewed

Motion for Bond (Doc. 4)

We denied these motions in a Memorandum Order dated October 18, 2005. (Doc. 155 of Cr. 00-72, and Doc. 5 of Civ. 04-1098). On October 31, 2005, Mr. Jackman appealed the denial of his motions to the Court of Appeals for the Third Circuit. (Doc. 157.) On January 25, 2006, while his appeal was pending, Mr. Jackman filed a Supplemental Memorandum of Law in Support of his Motion to Vacate (Doc. 161) further expanding on his irreconcilable indifference of law issues. On March 25, 2006, he filed a Motion for Return of Property Post Trial (Doc. 162). The Court denied his Motion for Return of Property Post Trial on March 27, 2006, which Mr. Jackman promptly appealed to the to the Court of Appeals for the Third Circuit on April 5, 2006 (Doc. 165).

On March 24, 2006, the Court of Appeals affirmed our denial of Mr. Jackman's renewed motion for Bond, and dismissed his other arguments for lack of jurisdiction since none of the other matters were final within the meaning of 28 U.S.C. § 1291 (Doc. 167). On August 16, 2006, Mr. Jackman filed a Motion to Transfer to the Court of Federal Claims under RCFC Rule 3.1 & 28 USC 1292 (d)(4)(B) (Doc. 169).

### *Evidentiary Hearing*

When a Motion is made under 28 U.S.C. §2255, the question of whether to order a hearing is committed to the sound discretion of the district court. In exercising that discretion, the court must accept the truth of the Petitioner's factual allegations unless they are clearly frivolous on the basis of the existing record. United States v. Day, 969 F.2d 39, 41-42 (3d Cir. 1992). Further, the court must order an evidentiary hearing to determine the facts unless the motion and files and records of the case show conclusively that the petitioner is not entitled to relief. Id.; United States v. Gordon, 979 F.Supp. 337, 339 (E.D. Pa. 1997).

As explained below, Mr. Jackman has asserted numerous frivolous claims. In addition, he continues to complain, in part, about the credibility of witnesses testifying at various hearings and at trial, while also asserting "new" evidence in the form of unsupported allegations. He offers no credible evidence or support to merit a hearing. Mr. Jackman largely bases his claims on arguments supported only by Mr. Jackman's assessment of the record evidence and testimony, as

6

well as "evidence" not of record and "witnesses" who did not testify. We find no need for an evidentiary hearing as the record conclusively establishes that the Petitioner is not entitled to the relief sought in the petition. 28 U.S.C. § 2255.

## I. Standard of Review under 28 U.S.C. §2255

Section 2255 of Title 28 of the United States Code provides a means of collaterally attacking a sentence imposed after a conviction. United States v. Cannistraro, 734 F.Supp. 1110, 1119 (D. N.J. 1989), aff'd, 919 F.2d 133 and 919 F.2d 137 (3d Cir. 1990), cert. denied, 500 U.S. 916. Pursuant to 28 U.S.C. §2255, a federal prisoner may move the sentencing court to vacate, set aside or correct a sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. §2255. Relief under this provision is "generally available only in 'exceptional circumstances' to protect against a fundamental defect which inherently results in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." United States v. Gordon, 979 F. Supp. 337, 339 (E.D. Pa. 1997), citing Hill v. United States, 368 U.S. 424, 428 (1962).

## II. Factual Background

As set forth above, Mr. Jackman raises numerous claims in which he challenges nearly all aspects of the investigation and prosecution. He asserts claims of bias and improper acts by his counsel, the court, the prosecution and its agents; and claims of ineffectiveness of his counsel. He also makes claims of improper jury selection and jury tainting; errors of law; and claims that the court unlawfully imposed an enhanced sentence by relying on facts not admitted by Mr. Jackman nor found by a jury. In addition, he challenges the denial of bail, the forfeiture proceedings following his conviction, as well as several other claims. The relevant factual background necessary for resolution of these claims is as follows.

7

### *Investigation, Arrest, and Search Warrant*

A search warrant and affidavit were prepared in this case that revealed the following background information. Court records from North Carolina were obtained that showed that Mr. Jackman had been convicted of crimes punishable by imprisonment for a term exceeding one year. In September, 1994, the sister of Mr. Jackman's girlfriend filed a police report against Mr. Jackman based on a letter received by her from Mr. Jackman. In the letter, Mr. Jackman threatened to shoot his girlfriend, and stated that he had 300 rounds of ammunition, an AK-47 assault rifle and a Mini-14 assault rifle that he had purchased at a gun show. He also stated that he knew a gun battle would result and that he would take several people with him.

In November, 1994, the FBI in Pittsburgh received a letter from Mr. Jackman in which Mr. Jackman refers to a Protection From Abuse order between him and a female individual. In the letter Mr. Jackman states that "Maybe if I shot her in the knee she would be hobbling around and be in the hospital . . ." On August 28, 1998, Mr. Jackman's girlfriend (the owner of the residence in question) purchased a Beretta handgun.

On August 5, 1999, a Major John Scarsellone of the Pennsylvania National Guard relayed information to the FBI in Pittsburgh concerning conversations between Mr. Jackman and a confidential source. The confidential source stated that Mr. Jackman is strongly anti-government and anti-law enforcement, and that Mr. Jackman talked of killing President Clinton and Secretary of State Madeline Albright. The confidential source also stated that Mr. Jackman believed that the federal government would eventually take his guns when the year 2000 arrived, and that Mr. Jackman told the source that he would kill any law enforcement officer who tried to take away his firearms. The source also stated that Mr. Jackman asked about the locations, times and weaponry to be used during monthly National Guard training exercises. According to the confidential source, Mr. Jackman had devised a plan to steal equipment and weaponry from the National Guard and that Mr. Jackman had offered the confidential source cash in exchange for military equipment and weaponry.

8

In March, 1999, Mr. Jackman told the confidential source that he had purchased a .44 Magnum handgun, a rifle, and a sawed-off barrel, pistol-gripped shotgun from a co-worker. Mr. Jackman also told the confidential source that he was going to pack his firearms in grease and bury them on his property. Mr. Jackman also invited the source to his residence for weapons training and target practice, but the source declined out of fear.

On August 17, 1999, Special Agent John Sharp, from the Federal Bureau of Investigation, along with Pennsylvania State Trooper Patrick Donohoe, interviewed the confidential source regarding the conversations the source had with Mr. Jackman. The source verified the information that Major Scarsellone had reported to the FBI on August 5, 1999, as well providing additional information.

The additional information from the source included stating that in July, 1999, he saw Mr. Jackman with a loaded 9 millimeter handgun, and a Colt AR-15 assault rifle with collapsible stock, heavy barrel, and thirty round magazine; that Mr. Jackman had blue tip ammunition, which the source believed was armor-piercing ammunition; that Mr. Jackman had taken one-half inch steel plates from work to his home, and returned the plates with bullet holes through them; and that in the Spring of 1999 Mr. Jackman had asked the source to steal body armor from the National Guard Armory to sell it to Mr. Jackman so that he could fashion a full body suit of ballistic resistant material. In May, 1999, Mr. Jackman asked the source to provide a bolt to an M-16 rifle and in July, 1999, Mr. Jackman asked the source for a lower receiver to an M-16 rifle. This information was corroborated in an interview with a police officer and member of the Pennsylvania National Guard who also spoke with the source. During an interview with Agent Sharp on August 17, 1999, the police officer stated that in May, 1999, the confidential source told the officer that Mr. Jackman had asked the source to steal an M-16 bolt from the National Guard Armory and sell it to Mr. Jackman. Finally, in "the fall of 1999," the source stated that Mr. Jackman manufactured a bracket at work so he could mount a gun safe in the basement of his residence.

Thus, the information provided from the confidential source came in part from two National Guardsmen (one of whom is also a police officer) who spoke with the source, the information was verified by further interviews, and the surveillance team's observations of Mr. Jackman were consistent with information provided from the source.

The FBI independently determined that Mr. Jackman resided at the house at 150 Caldwell drive by conducting a computer search in August 1999; observing Mr. Jackman at the residence from September 1999 through January 2000; and verifying his residence with the United States Postal Inspector on February 29, 2000.

On September 21, 1999, the surveillance team identified Mr. Jackman at the residence, and at 10:05 that night, an FBI aircraft was targeted by a laser sighting device emitted from the residence. The affidavit also presents information from Mr. Jackman's neighbor that in May, 1999, a red laser light appearing to come from 150 Caldwell Drive was shining through a window onto the neighbor's mini-blinds. The neighbor also reported that in July, 1999, she, her husband and their neighbors saw a red laser dot shining on the neighbor's mini-van; observed that an individual at 150 Caldwell Drive was shining a laser device at the neighbor's residence; and that this individual entered the residence at 150 Caldwell after being told to cease shining the light.

On January 15, 2000, the surveillance team observed Mr. Jackman leave 150 Caldwell Drive and enter a gun show held at the Greengate Mall. While at the gun show the surveillance team observed Mr. Jackman visit several vendors, handle various weaponry, remove a magazine from his breast pocket, and purchase weaponry and ammunition. Finally, the affidavit recites that the surveillance team obtained the license plate number from the automobile Mr. Jackman drove, discovered that the automobile was registered to Mr. Jackman and that his driver's license was reported as suspended by the Pennsylvania Department of Motor Vehicles.

A search warrant was issued and it was decided to execute the search on March 14, 2000. As a ruse to get Mr. Jackman out of his house so that the Agents could safely execute the search warrant, an FBI agent asked a supervisor at Mr. Jackman's unemployment office to telephone Mr.

10

Jackman to come to the office. On his way to the office Pennsylvania State Troopers pulled Mr. Jackman over. Initially, Agent Sharp planned to have the Troopers stop Mr. Jackman based on his suspended license. Agent Sharp was then informed that a traffic warrant had been issued for Mr. Jackman, and the State Troopers used that warrant as the basis for conducting a traffic stop of Mr. Jackman. The arrest warrant was issued on March 13, 2000, by Pennsylvania District Justice Susan Haggerty for nonpayment of fines and costs on a summary adjudication for driving while operating privileges were suspended. It was not important to Agent Sharp whether the Troopers stopped Mr.,. Jackman based on the newly issued arrest warrant or whether they stopped him because he was driving with a suspended licence. The Background regarding the warrant is set forth below.

After being pulled over, Mr. Jackman opened the glove compartment to retrieve his registration and a box of ammunition fell out. The troopers then searched the car and found a gun case under the passenger seat containing a loaded nine millimeter handgun and three fully loaded magazines. None of the evidence discovered in the car played any part in Mr. Jackman's trial.

The FBI agents also arrived on the scene of the stop, and Agent Sharp informed Mr. Jackman that he had a federal search warrant to search Mr. Jackman's residence at 150 Caldwell Drive. Agent Sharp asked Mr. Jackman if anyone was in the residence; where his girlfriend was located; whether there were any dogs at the residence; and whether there were any guns at the residence. Mr. Jackman responded that no one was in the home; his girlfriend was at work; there were five dogs at the house; and that yes there were guns in the residence. A search of the residence revealed numerous firearms and explosives, some of which formed the basis for the indictment in this case.

At the suppression hearing Mr. Jackman testified primarily about his initial detention and questioning, and the search of his residence. He testified that several times he asked two different agents for a lawyer, perhaps three or four times. He testified that he was handcuffed with his arms behind his back in an awkward and painful position, and that his handcuffs were very tight. He testified that he complained to several agents about the handcuffs and he was told if he signed a

11

waiver of his <u>Miranda</u> rights, the agents would take off his handcuffs and reapply them in front.
Mr. Jackman then testified that the agents did remove a handcuff so that he could sign the waiver;
however the agents then reapplied the handcuffs before questioning him.

Several agents testifying for the government reported that Mr. Jackman did not ask for a
lawyer, and several of the agents recalled that Mr. Jackman did complain about the handcuffs being
too tight. According to the agents, Mr. Jackman's handcuffs were removed so that he could sign the
waiver form and when reapplied the handcuffs were adjusted for comfort. The agents denied that
Mr. Jackman was told that the handcuffs would not be adjusted unless he signed the waiver form.

The various agents who had contact with Mr. Jackman described through their testimony
that the interactions with Mr. Jackman were, in general, "calm," "cordial," "non-confrontational,"
"non-argumentative." Agent Kevin L. McClincey, from the Internal Revenue Service, who was
present at the interview with Mr. Jackman after he was advised of his rights described Mr. Jackman
as initially reticent at first but that he then answered the agents' questions. Mr. Jackman did not
refute this testimony.

### State Arrest Warrant Issued by District Justice

An arrest warrant was issued for Mr. Jackman on March 13, 2000, by Pennsylvania District
Justice Susan Haggerty for nonpayment of fines and costs on a summary adjudication for driving
while operating privileges were suspended. The charge in the arrest warrant was withdrawn by the
Commonwealth of Pennsylvania due to the federal charges.

The underlying offense on which the arrest warrant was based began when Mr. Jackman
was stopped by the police on May 1, 1998, and issued a traffic citation for driving while operator's
license was suspended. Mr. Jackman's lawyer, James Coster, Esquire, who testified at the
suppression hearing, had determined that Mr. Jackman's suspension was erroneous and intended to
present his evidence at the hearing on the citation. However, on the day of the hearing, October 13,
1998, the District Justice found him guilty. Although Mr. Jackman was present at the office for the
hearing, he was in and out of the office at various times. Attorney Coster had telephoned the

12

District Justice's office to tell them he would be late for the scheduled hearing. When his case was called neither Mr. Jackman or his attorney were present. When Mr. Coster arrived he complained about the hearing being held in his and his client's absence and notified the office that he would be appealing. The traffic citation includes the notations that Mr. Jackman's attorney did not appear until after the hearing and that Mr. Jackman was to file an appeal.

An appeal was not filed within the 30 day time limit. Mr. Jackman alleges that the District Justice office misled him and his attorney by telling him the guilty verdict would be reversed and a new hearing would be scheduled. Relying on this information and other communications with the office, Mr. Jackman's attorney did not file an appeal of the adjudication of guilt within the 30 day appeal period.

Because of the guilty verdict, the Pennsylvania Department of Transportation notified Mr. Jackman through a "suspension letter" that his driver's license would be suspended. On December 1, 1998, attorney Coster filed an appeal of the suspension letter with the Department of Transportation. The appeal was dismissed on March 9, 1999. On June 1, 1999, Mr. Jackman's attorney filed for an appeal *nunc pro tunc* of the guilty verdict rendered on October 13, 1998. This appeal was denied.

On March 17, 1999, a Notice of Impending Warrant of Arrest was issued by the District Justice office regarding the May 1, 1998 citation and Mr. Jackman's failure to pay the full amount of the fine and costs. Mr. Jackman telephoned the office in response to receiving this notice. No arrest warrant was issued based on this notice. Apparently, at the same time Mr. Jackman and his attorney were notified that a payment determination hearing was scheduled for March 31, 1999. Attorney Coster's office mailed a letter to the District Justice, dated March 24, 1999, requesting a postponement of the payment determination hearing because of Mr. Coster's unavailability due to military duty.

Mr. Jackman received another citation for driving with a suspended license on September 29, 1999. A hearing was held and he was found not guilty apparently based on the police officer's

13

failure to verify the status of his driver's license with the Department of Transportation before the citation was issued. Mr. Jackman also appeared before District Justice Haggerty for a hearing on an harassment charge and was found guilty. At neither of these hearings was the issue raised of the May 1, 1998 guilty verdict or the outstanding fine and costs.

### *Post-Arrest, Pre-Trial and Trial*

Magistrate Judge Francis X. Caiazza granted the government's request for detention on March 17, 2000, following a hearing. Pretrial motions were filed and a motions hearing was set for December 12, 2000. On December 11, 2000, Mr. Jackman's court-appointed counsel filed a Motion to Determine Competency. The Court granted the motion and ordered that Mr. Jackman undergo a psychiatric examination to determine his competency to stand trial. Mr. Jackman disagreed with his counsel's suggestion that he was not competent to stand trial. Because of this conflict, the Court appointed Efrem M. Grail, Esquire, to represent Mr. Jackman for purposes of determining Mr. Jackman's competency. Mr. Grail then filed a motion for court appointment of a second psychiatric examiner, which was granted. Thus, following two separate psychiatric exams the Court held a competency hearing on September 10, 2001.

Mr. Jackman was found to be competent to stand trial. Due to the disagreement between Mr. Jackman and his original counsel regarding his competency, the Court appointed Efrem Grail to represent Mr. Jackman at trial. New counsel was permitted additional time to prepare for trial and to file updated or supplemental pretrial motions, which he did.

On January 9, 2002, the Court held a hearing on the pretrial motions. We orally denied Mr. Jackman's renewed motion for bail and issued a written opinion explaining our denial of Mr. Jackman's motion to suppress. (Opinion, January 24, 2002, Doc. 64.)

At the hearing Mr. Jackman also argued that the counts should be severed. Mr. Jackman argued that the likelihood is high that the evidence of prior crimes evidence introduced to prove Count I would cause the jury to improperly infer a criminal disposition and treat the inference as evidence of guilt in the possession of an unregistered firearm charge. The Court agreed but

14

granted Mr. Jackman's motion only in part, ordering that the trial be bifurcated, not severed. In so doing, we noted, that a "bifurcated trial here will address the defendant's concern that evidence of a prior felony conviction to prove Count I would prejudice Mr. Jackman when the jury deliberates on Count II." (Opinion, January 24, 2002, Doc. 64, at 24-25). Jury trial was set for February 11, 2002, with evidence and deliberations to be conducted first on the possession of an unregistered firearm charge (Count II), to be followed by evidence and deliberations on the possession of firearms by a convicted felon (Count I).

On January 30, 2002, prior to trial, Mr. Jackman filed a motion to dismiss the indictment arguing, in part, that his right to a speedy trial under the Sixth Amendment and the Speedy Trial Act, 18 U.S.C. §§ 3161-3174, had been violated. (Doc. 67.) We denied that motion in a written Order dated February 5, 2002. (Doc. 71.) We held a hearing prior to trial to address the remaining arguments in Mr. Jackman's motion. Those additional arguments are as follows.

Mr. Jackman argued that the charge of possession of an unregistered firearm should be dismissed for violation of due process due to spoilation of evidence. Count II of the Indictment set forth the charge of possession of unregistered firearm, alleged to be a "destructive device," as follows:

> That on or about March 14, 2000, in the Western District of Pennsylvania, the defendant, Donald G. Jackman, Jr.,did knowingly and unlawfully possess a firearm, as defined in Title 26, United States Code, Sections 5845(a) and 5845(f), that is, a destructive device consisting of a cardboard tube approximately 6 inches in length containing explosive powder, encased in metal roller bearings, with an ignition fuse, which was not registered to him in the National Firearms Registration and Transfer Record, as required by Title 26, United States Code, Section 5841.
> In violation of Title 26, United States Code, Sections 5861(d) and 5871.

Mr. Jackman argued that if the Government had not preserved, and in fact destroyed, the explosive powder identified in the charge in the indictment, this failure to preserve apparently exculpatory evidence would deny Mr. Jackman his right to due process of law.

15

Alternatively, he moved for dismissal of Count II arguing that the government could not prove that Mr. Jackman possessed a firearm, which in this case was a "destructive device." Mr. Jackman's argued that the "destructive device" described in the charge in the indictment was neither "designed nor redesigned for use as a weapon" and thus would not fall within the definition of a destructive device under 26 U.S.C. § 5845(f).

Finally, in his pretrial motion to dismiss the indictment Mr. Jackman moved to dismiss the charge of possession of a firearm by a convicted felon arguing that his rights of citizenship were restored by North Carolina and he was thus legally entitled to possess the firearms. He relied on a State of North Carolina certificate of unconditional discharge from sentence and restoration of rights dated January 16, 1997, issued after his parole on November 6, 1996. 9Restoration of Rights Certificate, attached as Ex. 4 to Mr. Jackman's Motion to Dismiss Indictment, doc. 67.) He argued that this certificate showed that his right to possess firearms was restored and thus the exception of 18 U.S.C. 921(a)(20) applied thereby making his possession of firearms lawful.

After hearing argument the Court denied Mr. Jackman's motions, and trial on Count II began. As noted, on February 14, 2002, a jury found Mr. Jackman guilty of possession of an unregistered firearm, and Mr. Jackman plead guilty to the charge of possession of firearms by a convicted felon. During the plea colloquy the court explained the circumstances of the change of plea as it related to the bifurcated trial and inquired of the defendant regarding his change of plea in light of the jury verdict as to Count II. In addition, defendant's counsel inquired of the defendant regarding their conversations leading to the change of plea and the defendant indicated that he understood and agreed with the change of plea. The defendant was found competent to plead, that he knew his rights, the elements the government would have to prove, and the penalties under the statute. The court noted that the defendant acknowledged his guilt and accepted his plea of guilty as to Count I.

Prior to sentencing Mr. Jackman filed a motion to withdraw his guilty plea, in which he also raised his restoration of rights argument. We denied that motion in writing, and also set forth our

16

reasoning for denying Mr. Jackman's restoration of rights argument on the merits. (Doc. 92.) As noted, Mr. Jackman was sentenced on September 17, 2002.

## III. Discussion

### A. Dismissal of Claims Already Litigated

In several of Mr. Jackman's claims he seeks to relitigate issues already raised and litigated in this Court. First, he seeks to relitigate the issue of whether his initial arrest in this action was based on an improperly issued State warrant for a citation offense that was under appeal. A hearing on this issue was held in which Mr. Jackman presented the District Justice who issued the citation and the arrest warrant, as well the attorney who represented Mr. Jackman with regard to several citations. (Tr. of Hearing on Pretrial Motions, January 9, 2002, at 124-181 (Doc. 76).) We addressed this issue in a written opinion and found it to be without merit. (Opinion, January 24, 2002, at 17-22 (Doc. 64).)

Mr. Jackman also seeks to relitigate the issue of whether the search warrant was supported by probable cause. This issue was also raised at the hearing on pretrial motions, and was disposed of by the Court in the January 24, 2002 written opinion. (Opinion, dated January 24, 2002, at 2-11 (Doc. 64).) Similarly, the issues of whether Mr. Jackman's Miranda rights were violated and whether his consent to search was valid if the statements and consent were coercively obtained through inflicting physical pain by the means and manner in which he was handcuffed were also raised at the pretrial hearing. We addressed these issues in our Opinion (Opinion, January 24, 2002, at 11, 16-17, 22-23 (noting that consent was not at issue with regard to searching the gun vault) (Doc. 64).)

Mr. Jackman also raises the issue of whether his speedy trial rights were violated in this Court. We issued an Order denying Mr. Jackman's motion to dismiss on the basis of a speedy trial violation in which we set forth the speedy trial calculations. (Order, February 5, 2002 (Doc. 71).)

In addition, Mr. Jackman makes several claims that concern his position that he was lawfully permitted to possess firearms based on a restoration of rights certificate from North

17

Carolina. This issue was raised in pretrial motions and oral argument was heard prior to trial. We orally denied his motion at the time, but later we set forth a written explanation for our denial in response to Mr. Jackman's motion to withdraw his guilty plea. (Doc. 92.) Mr. Jackman prematurely appealed our decision, and as explained below, out of an abundance of caution we will address this argument on the merits for the sake of completeness, as well as dismissing it because it was already litigated.

All of the above arguments were previously raised and litigated in this Court. Mr. Jackman is not entitled to re-litigate these issues in his section 2255 petition. Withrow v. Williams, 507 U.S. 680, 720-721 (1993) (Scalia, J., concurring) ("Prior opportunity to litigate an issue should be an important equitable consideration in any habeas case, and should ordinarily preclude the court from reaching the merits of a claim, unless it goes to the fairness of the trial process or to the accuracy of the ultimate result.") We decline to address these arguments again, except for the restoration of rights arguments.

## B. Procedural Bar

The government also argues that Mr. Jackman is procedurally barred from raising several of his asserted claims. The government contends that these claims were not raised on direct appeal, and as such are defaulted and may not be raised in a section 2255 motion except under specific circumstances. We agree.

### 1. Mr. Jackman's Claims are Procedurally Barred

In his appeal, Mr. Jackman argued the following issues:

1. that he should not have been convicted of possession of an unregistered destructive device because the prosecution failed to establish that he had the requisite intent because Mr. Jackman claimed the device was to be used for scaring geese from the pond.

2. that the government failed to preserve exculpatory evidence, namely the device itself

3. prosecutorial misconduct from the prosecutor's remarks in her opening statement that explosives or chemicals used to make explosives devices would not be brought into the courtroom, which were unfairly prejudicial.

18

4. that the District Court erred in denying him a downward departure from the Guideline Sentence range for (i) diminished capacity and (ii) under U.S.S.G. § 4A1.3, that the Guidelines calculation significantly over-represented his criminal history. In addition he argued that the District Court erred in failing to grant him a reduction for acceptance of responsibility for pleading guilty to Count I.

United States v. Jackman, 72 Fed.Appx. 862 (3d Cir. 2003).

The United States Court of Appeals for the Third Circuit concluded that there was sufficient

evidence to support the jury's conviction on Count II, specifically noting as follows:

the objective evidence before the jury indicated that the device found was a weapon, even if it was not intended as such. Expert testimony established the presence of explosive mixtures and explosives in the device, some of which were added to the commercially available device. Roller bearings were affixed by epoxy to the outside of the device and evenly spaced to provide for uniform fragmentation. This had the potential to cause injury or death.

Jackman, 72 Fed.Appx. at 865. Although the government was not required to prove intent, the

Court of Appeals noted that the government did "introduce circumstantial evidence of intent,

negating Jackman's purported reason for fashioning the device [that the device was to scare

geese]." Id.

The Court of Appeals also rejected Mr. Jackman's spoliation of evidence argument based

on the destruction of the device since he was unable to establish that the government acted in bad

faith, that the device possessed an apparent exculpatory value and, that the destroyed evidence was

irreplaceable. Id. at 866-867 (citing United States v. Femia, 9 F.3d 990, 993-94 (1st Cir.1993)).

The Court of Appeals also found that there was no prosecutorial misconduct and rejected Mr.

Jackman's arguments regarding his sentencing. Id. at 867-869.

Several of the issues Mr. Jackman raises now could have been raised on direct review but

were not; therefore they are procedurally barred. Bousley v. United States, 523 U.S. 614, 621 (U.S.

1998). We find that the following issues are issues that Mr. Jackman could have raised on direct

appeal, but did not, and thus are procedurally barred:

• Mr. Jackman's claims challenging his initial detention, handcuffing, the waiver of his Miranda rights and his consent to search, his arrest, the aircraft surveillance, and the search and search warrant;

• Mr. Jackman's claims of improper jury selection and that the jury was tainted;

19

• Mr. Jackman's claims of violations of his First Amendment right to petition the government for a redress of grievances;

• Mr. Jackman's claims that the Court lacked jurisdiction over him because Title 18 and 26 lacked the required enacting clauses; no reason was given for ignoring the Pennsylvania Constitution's right to bear arms; there was no violation because there was no "ownership" of the firearms; and no nexus to interstate commerce;

• Mr. Jackman's claims of perjury by the confidential source, federal agents, and unnamed others;

• Mr. Jackman's claims of a violation of his Fifth Amendment protection against double jeopardy based on the forfeiture of firearms and on his argument that he engaged in legal conduct made illegal only by use of his past conviction;

• Mr. Jackman's claim that he was denied his Sixth Amendment right to confront witnesses against him;

• Mr. Jackman's claim that his conviction was improperly secured based on the bias and prejudice of the Court;

• Mr. Jackman's claim of a Constitutional violation through altering or removing of testimony and evidence from the transcribed record;

• Mr. Jackman's claim that he was unconstitutionally denied bail based on misrepresented facts, unrelated issues, and a fabricated "fictitious" danger to the community;

• Mr. Jackman's claim of a violation of the right to a compulsory process of witnesses in favor of the defense through intimidation by the government against witnesses.

All of the above listed claims were available to Mr. Jackman on appeal but he did not raise

them. Thus, these claims are procedurally barred and must be dismissed unless Mr. Jackman can

show cause and prejudice, or actual innocence.

## 2. Cause and Prejudice

"Where a defendant has procedurally defaulted a claim by failing to raise it on direct

review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause'

and actual 'prejudice,'or that he is 'actually innocent.'" Bousley, 523 U.S. at 622 (citing Murray v.

Carrier, 477 U.S. 478, 485 & 496 (1986); Wainwright v. Sykes, 433 U.S. 72, 87 (1977); and Smith

v. Murray, 477 U.S. 527, 537 (1986); see also United States v. Frady, 456 U.S. 152, 167-68

(1982)).

20

To show cause, the petitioner "must establish that 'some external impediment' prevented him from raising the claim." Wise v. Fulcomer, 958 F.2d 30, 34 n. 9 (3d Cir. 1992 ) (quoting McClesky v. Zant, 499 U.S. 467 (1991); see also Frady, 456 U.S. at 170). "Prejudice exists where 'errors at trial . . . worked to [petitioner's] actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions.'" Coleman v. Thompson , 501 U.S. 722, 753 (1991); Murray v. Carrier, 466 U.S. 478, 494 (1986); see also Frady, 456 U.S. at 170.

"Actual innocence" is concerned, with actual, as opposed to legal, innocence. Calderon v. Thompson, 523 U.S. 538, 559 (1998). "To establish actual innocence, petitioner must demonstrate that, ' "in light of all the evidence,"' 'it is more likely than not that no reasonable juror would have convicted him.'" Bousley, 523 U.S. at 623 (quoting Schlup v. Delo, 513 U.S. 298, 327-328 (1995)).

Mr. Jackman's only claim that he was actually innocent concerns his arguments regarding the restoration of rights certificate and evidence that he was able to purchase firearms during the period of time in which federal law prohibited him from possessing firearms. As set forth below, however, these claims are without merit, and of course Mr. Jackman admitted that he was in fact guilty of being a felon in possession of a firearm. It is arguable that Mr. Jackman also makes a claim of actual innocence based on his assertion that the destructive device was not a destructive device but was merely a pest control device. However, in contrast to Mr. Jackman's unsupported assertion, there is the evidence at trial, the conviction by the jury, and the affirmance of his conviction on appeal, that overwhelmingly show that the device was a destructive device. Mr. Jackman's factual guilt has been established. Mr. Jackman has no serious argument to rebut the evidence that he possessed a destructive device.

The only grounds for cause for his procedural default argued by Mr. Jackman is ineffective assistance of counsel. Ineffective assistance of counsel claims are properly brought for the first time via collateral attack in a 28 U.S.C. §2255 Motion. United States v. Thornton, 327 F.3d 268, 271-72 (3d Cir. 2003). We address Mr. Jackman's claims of ineffectiveness of counsel next.

21

## C. Ineffective Assistance of Counsel

Mr. Jackman claims that his counsel was ineffective for a number of reasons, among them withholding exculpatory evidence; failing to object to acts of perjury, miscarriage of justice, and altering of transcripts; failure to pursue speedy trial issues, restoration of rights issues, entrapment by estoppel, matters of first impression, issues of ambiguous nature, the issue of whether notice of firearm purchase puts one in violation of law, double jeopardy, witness issues, issues of improper prosecution acts towards defense witnesses, and a general failure to pursue defenses; failure to object to the application of the Armed Career Criminal enhancements; and failure to object to competency examination.

### 1. Applicable Law

"A claim of ineffective assistance requires a defendant to establish that counsel's representation fell below an objective standard of reasonableness and that the deficient performance prejudiced the defendant." McAleese v. Mazurkiewicz, 1 F.3d 159, 166 (3d Cir. 1993); Strickland v. Washington, 466 U.S. 668, 687-688 (1984), cert. denied, 510 U.S. 1028 (1993). "To establish prejudice, a defendant must demonstrate that there is a 'reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Weeks v. Snyder, 219 F.3d 245, 257 (3d Cir. 2000) (quoting Strickland, 466 U.S. at 694).

In assessing the first prong, the Supreme Court has instructed that "[t]he proper measure of attorney performance" is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688. This is an objective standard, and must be "viewed to the extent possible without 'the distorting effects of hindsight.'" Duncan v. Morton, 256 F.3d 189, 200 (3d Cir. 2001) (quoting Strickland, 466 U.S. at 688-90). In addition, a "reviewing court 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" McAleese, 1 F.3d at 175 (quoting Strickland, 466 U.S. at 692).

Addressing the second part of the Strickland analysis, the prejudice prong, the Supreme Court has explained that a "reasonable probability" is one that is "sufficient to undermine

22

confidence in the outcome." Id. at 694. In making the prejudice determination, the court must consider the totality of the evidence. Id. at 695.

A claim of ineffective assistance must identify the specific errors counsel has made. Conclusory allegations are not sufficient to support a petition under Section 2255. Blackledge v. Allison, 431 U.S. 63, 74 (1977).

### 2. Analysis of Ineffectiveness Claims

Initially we note that counsel is not ineffective simply for failing to raise an issue on appeal, provided that the representation was reasonable professional conduct. Jones v. Barnes, 463 U.S. 745, 754 (1983). There is no evidence before us to indicate that appellate counsel's conduct in this case was in any way constitutionally deficient. Given the record evidence in this case there was virtually no chance of success on any of the issues Mr. Jackman complains of on appeal. Thus, we find that counsel was not ineffective for failing to pursue issues on appeal.

We need only credit Mr. Jackman's nonfrivolous factual claims in support of his ineffectiveness claims. Day, 969 F.2d at 41-42. We find that virtually all of Mr. Jackman's ineffectiveness claims are frivolous claims that we need not credit.

As already noted, counsel in fact did raise a speedy trial defense and a restoration of rights argument. Moreover, counsel explicitly stated at the plea hearing that if the parties were to proceed to trial on Count One, that counsel was going to put on an estoppel defense, but Mr. Jackman's plea of guilty acted as a waiver of the argument. Mr. Jackman's counsel also did object to the application of the Armed Career Criminal enhancements, but the objection was unsuccessful.

Mr. Jackman sets forth no evidence to support his claims that counsel was ineffective for failing to object to perjury and for failing to object to alleged altering of transcripts. These claims are not only vague and conclusory, but also plainly frivolous.

While counsel did not pursue a "double jeopardy" defense, his failure to do so does not amount to ineffective counsel. Mr. Jackman argues that he was subjected to double jeopardy (and triple jeopardy) through the forfeiture of his firearms in addition to his sentence. Had counsel

23

pursued this defense it would not have been successful as the forfeiture is not a violation of double jeopardy. United States v. One Assortment of 89 Firearms, 465 U.S. 354, 366 (1984); Helvering v. Mitchell, 303 U.S. 398-399 (1938). Mr. Jackman also argues that he was subjected to double jeopardy through the use of his prior felony conviction serving as a basis for his conviction for being a felon in possession of firearms, arguing that he is being punished twice for the same crime (the prior felony). However, this argument too would not have been successful as Mr. Jackman was punished under a validly enacted statute that prohibits felons from possessing firearms, a restriction that the United States Supreme Court has upheld. Lewis v. United States, 445 U.S. 55, 65-66 (1980).

Mr. Jackman's claim that his counsel was ineffective for failing to object to competency examinations also does not constitute ineffectiveness of counsel. Mr. Jackman's counsel's performance with respect to competency issues was at a minimum reasonable under prevailing professional norms, and in fact was above professional norms. There was no error by counsel in this regard.

To the extent that we did not isolate and name each single instance of claimed ineffectiveness it is because such claims have already been shown to be without merit or that such claims are frivolous.

We feel that we must comment on Mr. Jackman's allegations about Mr. Grail's alleged ineffective counsel. Mr. Jackman was first represented by an experienced and very competent federal public defender. This relationship with her so deteriorated that she asked to be relieved. We granted her request, and then, after a particularly difficult search for competent counsel obtained the services of Mr. Grail, a partner in one of Pittsburgh's leading law firms. In our opinion Mr. Jackman received outstanding representation form Mr. Grail

Accordingly, we find that his counsel was not ineffective.

24

### D. Mr. Jackman's Remaining Claims

We now address some of Mr. Jackman's remaining claims.

#### 1. Vague, Conclusory, and Frivolous Claims

We will not specifically address each and every possible claim asserted by Mr. Jackman in his Petition and in his various related pleadings because the claims not mentioned are at best vague, conclusory, and not supported by evidence, and we find that said claims are frivolous. We present as representative of the frivolous nature of many of Mr. Jackman's claims the following.

Mr. Jackman complains of a Constitutional violation of the right to discovery and profits from his invention of a goose dispersal device. This is nothing more than a frivolous attack on the sufficiency of the evidence. The Third Circuit Court has already ruled on this issue:

> Here, the objective evidence before the jury indicated that the device found was a weapon, even if it was not intended as such. Expert testimony established the presence of explosive mixtures and explosives in the device, some of which were added to the commercially available device. Roller bearings were affixed by epoxy to the outside of the device and evenly spaced to provide for uniform fragmentation. This had the potential to cause injury or death.
> Nonetheless, the prosecution *did* introduce circumstantial evidence of intent, negating Jackman's purported reason for fashioning the device. Jackman's girlfriend, with whom he was then living, testified that Jackman often fed cracked corn to geese at the pond, that the geese did not give off the odor that purportedly motivated him to build the device, and that Jackman had even told her that he could not hurt an animal. We believe this evidence, especially when considered in light of the substantial discretion afforded to the juries who actually see and hear the testimony of the parties and witnesses and can thereby more properly judge their credibility, is sufficient to support Jackman's conviction.

Jackman, 72 Fed.Appx. at 865-866.

He complains about the failure to produce audio tapes when no audio recordings were made of any hearing in this case. He complains about our not reading the complete text of the North Carolina Restoration of Rights Certificate into the record, but the certificate itself was already made a part of the record by Mr. Jackman when he attached it as an exhibit to his pleading.

He continues to complain that his Constitutional rights were violated as a result of surveillance by an aircraft using infrared technology without a warrant. This statement has no support in the record evidence. Mr. Jackman continues to pursue this argument, in part, on the

25

basis of evidence not introduced at the suppression hearing or at trial; namely, that his dogs saw the infrared illumination and that he confirmed the infrared illumination with his night vision scope. Although Mr. Jackman testified at the suppression hearing, he did not testify as to this issue.

Related to this claim is Mr. Jackman's complaint that there was no evidence that he was not using a benign laser pointing device to aim at the aircraft, and no evidence that he was using a firearm in relation to the laser beam. We note that there was no evidence introduced to show either that Mr. Jackman *was* using a benign laser pointing device, or that the investigating agents *knew* that Mr. Jackman was using a benign laser pointing device. In fact, on cross-examination by Mr. Jackman's counsel, Agent Sharp admitted that the laser light could have been from a benign laser pointer; that he had no information positively identifying Mr. Jackman as the person controlling the laser light in any of the three instances; and that someone could have been using a laser pointer to play with dogs and the beam accidently shined on a neighbor's blinds and on a moving vehicle. (Tr. of Suppression Heargin, at 44-48.) Nonetheless, in light of all the information known to Agent Sharp, he reasonably suspected that the laser beam was coming from a laser sighting device for a firearm. (Tr. of Suppression Hearing, at 6.)

Under these circumstances and in light of the other information already gathered by the agents, it was entirely reasonable to infer that the laser beam was a laser targeting device attached to a firearm. When viewing the affidavit in support of the search warrant the magistrate judge views the cumulative evidence in a commonsense manner. Thus, even if it was true that Mr. Jackman was using a benign laser pointing device not attached to a firearm, it would not affect our conclusion that the issuance of the search warrant was supported by probable cause.

Finally, Mr. Jackman also presents a frivolous claim that bases his argument on statutory text from Title 8 of the United States Code, entitled **Aliens and Nationality**. During this case it is true that the term "right of citizenship" has arisen, however this case has nothing to do with Title 8. One might credit Mr. Jackman with developing "creative" legal arguments such as this one, and his argument regarding the enacting clause in Title 1 section 101. However, we need not address such

26

arguments that, while appearing logical to Mr. Jackman, are in the eyes of the law absurd on their face.

### 2. Collateral Claims Challenging Count I

Mr. Jackman plead guilty to Count I of the indictment which charged that Mr. Jackman, a convicted felon, knowingly possessed firearms in and affecting commerce in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).

Since Mr. Jackman collaterally attacks his conviction on Count I after his guilty plea, the Court's inquiry is limited to whether Mr. Jackman made a voluntary and intelligent plea of guilty with the advice of competent counsel. Mabry v. Johnson, 467 U.S. 504, 508 (1984), see also United States v. Broce, 488 U.S. 563, 569 (1989) (inquiry is confined to whether the pleas was both counseled and voluntary). In addition, "the voluntariness and intelligence of a guilty plea can be attacked on collateral review only if first challenged on direct review." Bousley v. United States, 523 U.S. 614, 621 (1998). As the United States Supreme Court has stated, "'the concern with finality served by the limitation on collateral attack has special force with respect to convictions based on guilty pleas.'" Bousley, 523 U.S. 621 (quoting United States v. Timmreck, 441 U.S. 780, 784 (1979)). Mr. Jackman did not challenge his guilty plea on direct appeal, and is thus generally foreclosed from rasing the claim now.

Turning to his various arguments, Mr. Jackman first complains that he was not permitted to withdraw his plea to Count I by arguing that his plea was illegally induced after conviction by a tainted jury on Count II (he also explains this claim as being unjustly forced into pleading guilty to Count I as a result of the coercion and manipulation of the jury). This is framed as a claim that his guilty plea was involuntary, but it is in fact an attack on his jury conviction on Count II since Mr. Jackman's argument is that but for the jury being tainted during his trial on Count II resulting his conviction on that Count, he would not have had "no choice" but to plead guilty to Count I.

Mr. Jackman's claims that the jury was coerced, manipulated, and tainted include the following: that the jury was led to believe that Mr. Jackman had killed someone; unspecified

27

prejudicial statements made by the prosecutor; unspecified prosecutorial misconduct, and the use of an enlarged photo of the destructive device, that was actually measured in inches. We find that Mr. Jackman's claims are subject to dismissal because they are vague and conclusory. United States v. Thomas, 221 F.3d 430, 437 (3d Cir. 2000) ("vague and conclusory allegations contained in a §2255 petition may be disposed of without further investigation"); United States v. Dawson, 857 F.2d 923, 928 (3d Cir.1988). To the extent that Mr. Jackman argues that his plea was involuntary due to the failure to disclose the terms of the plea bargain, we note simply that there was no plea agreement in this case. We believe, however, that Mr. Jackman is not making such a claim but is instead making the frivolous argument that his plea was involuntary because he was not informed that the prosecution was going to withhold evidence and taint the jury thereby leaving him no choice but to plead guilty.

Mr. Jackman's claim that he was "not permitted" to withdraw his plea to Count I is a reference to our Memorandum Order dated March 18, 2002, in which we denied his Motion for Withdrawal of Guilty Plea submitted as a letter by Mr. Jackman purporting to give notice that he is withdrawing his plea of guilty. (Doc. 92, with Mr. Jackman's Letter attached as Appendix A.) In his Letter/Motion, Mr. Jackman had argued that he was actually innocent explaining:

> My rights of citizenship have been restored which makes me guilty of no more than legally exercising my Pa. and U.S. Constitutional rights. If this has now become a crime its even more reason to p[u]rsue this matter.
> I cannot let this fact go unchallenged in the courts.

(Letter from Donald Jackman, dated February 22, 2002 (Appendix A), attached to Doc. 92, treated as a Motion to Withdraw Guilty Plea). We denied the motion explaining in part as follows:

> Mr. Jackman asserts his innocence on the basis of an issue of law that the court has already decided. This issue is preserved for appeal if the defendant chooses to take an appeal. Thus, he will be able to challenge the court's ruling in the appeals court. Therefore, insofar as defendant seeks to withdraw his plea based on his asserted innocence, we find that Mr. Jackman has failed to present a fair and just reason for withdrawing his guilty plea.

(Doc. 92, at 5.) Mr. Jackman prematurely appealed our Memorandum Order, and the United States Court of Appeals for the Third Circuit stayed the appeal pending entry of a Judgment and

28

Commitment order by the District Court. (Doc. 95.) The Third Circuit Court also directed Mr. Jackman to inform the Third Circuit Clerk in writing as to the date the District Court enters a Judgment and Commitment order, and explained that "it is not necessary to file a subsequent Notice of Appeal after the Judgment and Commitment order has been entered." (Doc. 95.) There is no indication in the Third Circuit Court's Opinion that Mr. Jackman argued this issue on appeal. However, it is apparent that the Third Circuit Court was aware of the issue and explicitly told Mr. Jackman that he did not need to raise it again. In addition, Mr. Jackman claims that the failure to raise and argue the issue despite its explicit preservation in the Third Circuit Court constitutes ineffectiveness of counsel. Under these circumstances we will address the substance of the restoration of rights argument below, which also applies to Mr. Jackman's ineffectiveness claim on this issue.

Mr. Jackman also argues that the Indictment was invalid from the beginning because at no time did he ever have "actual or constructive" possession of any firearm, he only had "ownership." This argument, insofar as we can understand it, seems to be that the government never proved that Mr. Jackman legally possessed the firearms and thus has failed to establish an essential element of a violation of 18 U.S.C. §§ 922(g)(1) and 924(e), namely that he "knowingly possessed" firearms. Mr. Jackman did not challenge his guilty plea on appeal and he cannot do so now. In addition, by pleading guilty Mr. Jackman admitted to all the elements of Count I as well the material facts supporting Count I, thus freely acknowledging that he is in fact guilty of Count I. In light of his admissions he cannot now attack his conviction on Count I for failure to establish an essential element.

In a group of claims that are somewhat related to Mr. Jackman's "possession" argument, he claims that his conviction on Count I was unlawfully secured when his Entrapment by Estoppel argument was unable to be asserted due to the withholding of firearms records showing the validity of his ownership of the firearms. Mr. Jackman also explains, in other words, that the government approved of his purchase of firearms instead of denying the purchases or informing him that his

29

purchase of the firearms would be in violation of the law. He also claims that exculpatory evidence of his compliance with all firearm and explosives laws (presumably the above-referenced firearm records) was withheld by the prosecution. An additional facet to this argument is that Mr. Jackman believed that he was in fact able to possess firearms based on a North Carolina State Restoration of Rights Certificate, which he also alleges the Court failed to read into the record in its entirety.

Again, since Mr. Jackman validly plead guilty to being a convicted felon in possession of firearms and because he did not raise a challenge to his guilty plea on appeal he is foreclosed from raising these claims now. We also note that during his plea colloquy counsel for Mr. Jackman informed the Court that had he gone to trial Mr. Jackman would have raised the defense of Entrapment by Estoppel arguing that he had an honest belief that he had a right to own the firearms. (Tr. of Plea Hearing, at 27). By pleading guilty instead, he in fact waived those arguments.

With respect to his claim of withheld exculpatory evidence, we note that this issue is not really pertinent in that even if Mr. Jackman was able to successfully purchase firearms, that says nothing about the fact that he was a convicted felon who was forbidden from possessing firearms. We understand that Mr. Jackman's argument is that it is strange and unfair that he was permitted to purchase firearms if he really was prohibited from possessing firearms. Thus, he argues that he was "entrapped" since he should have been unable to purchase the firearms, and he implies (but does not argue) that if had known he was forbidden from possessing firearms he would not have. He does not argue this because from the beginning Mr. Jackman has always believed he had the unfettered right to possess firearms. Instead he argues for estoppel based on his theory that once he had successfully purchased firearms, the government was estopped from complaining about his possession of firearms because they missed their chance and also led Mr. Jackman to believe that he was acting lawfully. In the absence of any supporting evidence showing a true entrapment, however, the beginning and end of this story is that Mr. Jackman was prohibited by federal law from possessing firearms, regardless of his ability to successfully purchase firearms, and he in fact unlawfully possessed firearms.

30

### 3. Claim Regarding Restoration of Rights Certificate

As previously stated, Mr. Jackman's claims challenging Count I are dismissed since they were waived when he plead guilty to Count I, and because he failed to raise a challenge to his guilty plea on direct appeal. In addition, all of Mr. Jackman's claims based on his restoration of rights argument should be dismissed because it was raised and litigated before this Court. Mr. Jackman first raised the issue in his motion to dismiss. (Doc. 67, with brief in support, doc. 68.) Oral argument was heard on the issue prior to trial. (Tr. of Proceedings, February 11, 2002, at 14-16, doc. 103.) We denied the motion orally (see docket entry no. 83), and also set forth a written explanation as to why his restoration of rights argument was without merit in denying Mr. Jackman's motion to withdraw his guilty plea (doc. 92). As previously stated however, we will address this argument on its merits.

Mr. Jackman argues that because his rights of citizenship were restored by North Carolina he was legally entitled to possess the firearms. He relies on a State of North Carolina certificate of unconditional discharge from sentence and restoration of rights dated January 16, 1997, issued after his parole on November 6, 1996. (Attached to this Opinion as Appendix "A.") He argues that this certificate showed that his right to possess firearms was restored thereby making his possession of firearms lawful.

Mr. Jackman was charged with violating $922(g)(1)$ and $924(e)(1)$ in that he is alleged to have possessed firearms after having been convicted of a crime punishable by imprisonment for a term exceeding one year. "Not all violent felony convictions, however, count for purposes of 922(g) or 924(e)." Caron v. United States, 524 U.S. 308, 312, 118 S.Ct. 2007, 2011 (1998). Section 921(a)(20) provides, in relevant part,

> What constitutes a conviction of such crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. **Any conviction . . . for which a person . . . has had civil rights restored shall not be considered a conviction for purposes of this chapter,** unless such . . . restoration of civil rights expressly provides that the person may not . . . , possess, . . . firearms.

18 U.S.C. § 921(a)(20)(emphasis added).

The State of North Carolina Certificate of Unconditional Discharge contains the following

relevant language:

> FOR CONVICTED FELONS ONLY – RESTORATION OF RIGHTS.
>
> PURSUANT TO SECTION 13-1 OF THE GENERAL STATUTES OF NORTH CAROLINA, ALL RIGHTS OF CITIZENSHIP WHICH WERE FORFEITED ON CONVICTION ARE BY LAW AUTOMATICALLY RESTORED WITH THE EXCEPTION OF THE RIGHT TO OWN, POSSESS, RECEIVE, BUY OR OTHERWISE ACQUIRE FIREARMS. THIS RIGHT IS PRECLUDED FOR FIVE YEARS TO SOME FELONS BY SECTION 14-415.1 OF THE GENERAL STATUTES OF NORTH CAROLINA.
>
> THE POST-RELEASE SUPERVISION AND PAROLE COMMISSION DOES HEREBY CERTIFY THAT PURSUANT TO §§ 13.1/13.2/148-49.15(D) OF THE GENERAL STATUTES OF NORTH CAROLINA, ALL RIGHTS OF CITIZENSHIP WHICH THE SAID: DONALD G. JACKMAN FORFEITED ON CONVICTION ARE BY LAW AUTOMATICALLY RESTORED.

(Appendix "A.") Mr. Jackman contends that this restoration of rights was full, final and complete, and restored his right to possess firearms. He argues that the exception of 18 U.S.C. 921(a)(20) applies to him since he is a person who has had his civil rights restored and he is not subject to conviction for purposes of the statute. Therefore, he argues that his possession of firearms is lawful.

The Supreme Court interpreted section 921(a)(20) in Caron, and noted that "While state law is the source of law for restorations of other civil rights, however, it does not follow that state law also controls the unless clause." Caron, 524 U.S. at 316, 118 S.Ct. at 2012. The "unless" clause of section 921(a)(20) comes after the statutory language limiting convictions under the chapter to be determined by State law and if a State law restores a person's civil rights there will not be a conviction under this chapter "unless such . . . restoration of civil rights expressly provides that the person may not . . . , possess, . . . firearms." 18 U.S.C. § 921(a)(20).

The Supreme Court explained that "[a]s to the possession of weapons, . . . the Federal Government has an interest in a single, national, protective policy, broader than required by state law." Id. Therefore, if a State concludes that a convicted felon is too dangerous to possess certain weapons, even if it allows him to possess some weapons, then "Federal law uses this state finding

32

of dangerousness in forbidding petitioner to have any guns." Id. at 317, 118 S.Ct. at 2012. That is the case for Mr. Jackman.

"In determining whether a 'restoration of civil rights expressly provides that the person may not . . . possess . . . firearms,' we look to the law of the jurisdiction of conviction, (here, the State of North Carolina), and consider the jurisdiction's entire body of law, not merely, for example, the jurisdiction's certificate of restoration of rights, received upon discharge of a conviction." United States v. O'Neal, 180 F.3d 115, 119 (4th Cir. 1999), cert. denied, 120 S.Ct. 433 (2000). Here, the Certificate itself states "Pursuant to Section 13-1 of the General Statutes of North Carolina, all rights of citizenship which were forfeited on conviction are by law automatically restored **with the exception of the right to own, possess, receive, buy or otherwise acquire firearms**. This right is precluded for five years to some felons by Section 14-415.1 . . ." (Appendix "A", emphasis added). Even though Mr. Jackman received a "restoration of rights," he also was expressly precluded from possessing firearms for five years from his parole or conditional release on November 6, 1996, or until November 6, 2001. Thus, the "unless" clause of section 921(a)(20) is triggered, and federal law forbids defendant from possessing any firearms. The arrest and search warrant occurred on March 14, 2000, well before the right to firearms would have been automatically restored pursuant to North Carolina law. Mr. Jackman's collateral attack on his conviction on Count I based on his restoration of rights argument therefore must fail.

### 4. Denial of Medical Care

We agree with the government that Mr. Jackman's claim that he was denied proper medical attention after excessive time in handcuffs in violation of the Sixth, Eighth and Fourteenth Amendment's is improperly raised in a section 2255 petition. We will therefore dismiss this claim without prejudice.

### 5. Blakely Claim

Mr. Jackman also claims that his sentence was imposed in violation of the United States Supreme Court's decision in Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004). Of

33

course, the issues raised in Blakely were finally settled by the United States Supreme Court in United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005). "Blakely, as the Court of Appeals for the Seventh Circuit pointed out, reserved decision about the status of the Federal Sentencing Guidelines, and Booker established a new rule for the federal system." Lloyd v. United States, 407 F.3d 608, 611 n.1 (3d Cir. 2005) (citing McReynolds v. United States, 397 F.3d 479, 481 (7th Cir. 2005)).

The United States Court of Appeals for the Third Circuit has determined that Booker challenges are not applicable to collateral review claims like Mr. Jackman's. Lloyd , 407 F.3d 608. In Lloyd, the Third Circuit court held that although the rule announced in Booker qualifies as a new rule or criminal procedure, it is not to be applied retroactively to prisoners whose judgment was final and who are in the initial § 2255 motion stage as of the date that the Booker decision was issued. "Because Booker announced a rule that is 'new' and 'procedural,' but not 'watershed,' Booker does not apply retroactively to initial motions under § 2255 where the judgment was final as of January 12, 2005, the date Booker issued." Lloyd, 407 F.3d at 616-617. Mr. Jackman's judgment was final no later than January 4, 2004. Accordingly, the rule announced in Booker is not applicable to Mr. Jackman given that his judgment was final and he was in the initial § 2255 motion stage as of the date that the Booker decision was issued. Thus, this claim will be dismissed.

### E. Certificate of Appealability

The remaining issue before this Court is whether a certificate of appealability ("COA") should be issued with respect to Mr. Jackman's motion to vacate. In Slack v. McDaniel, 529 U.S. 473, 120 S.Ct. 1595 (2000), the United States Supreme Court held that "[w]hen the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. Slack, 529 U.S. at 484. Here, we find that jurists of reason would not find it

34

debatable whether Mr. Jackman states a valid claim of the denial of a constitutional right and jurists of reason would not find it debatable whether we were correct in our procedural ruling that his motion was procedurally barred. We also conclude that Mr. Jackman has failed to show a substantial denial of a constitutional right. Accordingly, a certificate of appealability will not be issued with respect to Petitioner's motion to vacate.

**IV. Conclusion**

Mr. Jackman's section 2255 motion will be denied, and a certificate of appealability will not be issued.

Accordingly, the following order is therefore entered.

AND NOW, to-wit, this **21** day of December, 2006, for the reasons stated above, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

1. Petitioner's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255 (Doc. 140), be and hereby is DENIED in all respects except as to his claim that he was denied proper medical attention after excessive time in handcuffs in violation of the Sixth, Eighth and Fourteenth Amendment.

2. Petitioner's claim in his Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255 (Doc. 140), that he was denied proper medical attention after excessive time in handcuffs in violation of the Sixth, Eighth and Fourteenth Amendments, be and hereby is DENIED without prejudice, since it was improperly raised in his section 2255 petition.

3. Petitioner's Motion to Transfer to the Court of Federal Claims under RCFC Rule 3.1 & 28 USC 1292 (d)(4)(B) (Doc. 169), be and hereby is DENIED.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that a certificate of appealability SHOULD NOT ISSUE with respect to this Court's instant Order denying Mr. Jackman's § 2255 Motion because, for the reasons set forth in the Opinion accompanying this Order

35

which addresses his § 2255 Motion, Mr. Jackman has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). See also Third Circuit Local Rule 22.2 (stating that "[i]f an order denying a petition under . . . § 2255 is accompanied by an opinion . . . it is sufficient if the order denying the certificate [of appealability] references the opinion . . . .").

Maurice B. Cohill, Jr.
Senior United States District Judge

cc:    Donald G. Jackman, Jr.
       No. 06804068
       FCI- McKean
       P.O. BOX 8000
       Bradford, PA 16701

       Kelly Labby, AUSA          (by electronic mail)
       United States Attorney's Office
       700 Grant Street, Suite 400
       Pittsburgh, PA 15219

       Efrem Grail, Esquire